THE PEOPLE EX REL. ELI v. BENSON.

1. ATTORNEY AT LAW—DISBARMENT PROCEEDINGS.
If an attorney honestly believes he is the owner of money in the hands of an officer taken from a person·charged with robbery and held pending a prosecution, and believes it is not the money of the person alleged to have been robbed, although he is altogether wrong upon all points in his attempt to get the money, he is not guilty of attempting to defraud the claimant of the money, or of abuse of the process of the courts such as to cause his disbarment.

2. SAME.
An attorney should not suffer the penalty of disbarment for misconceiving the facts or the law, or the remedy for the enforcement of rights believed to belong to a client. If, however, he were actuated by corrupt or dishonest motives, or wrongfully and intentionally defrauded, or attempted to defraud, another, he should be disbarred.

3. SAME.
It is not the proper practice to entertain disbarment proceedings while the conduct complained of is already being investigated in an appropriate action; and where the alleged wrong is committed during or in connection with the judicial trial of an action, the disbarment proceedings should be ·postponed, or its hearing suspended until the termination of the action.

4. SAME.
Before an attorney charged with unprofessional conduct is deprived of his license and cut off from the practice of a profession by which he earns his living, the charges should be established by clear, convincing and satisfactory evidence.

5. SAME—PREVIOUS REPUTATION.
In a disbarment proceeding the previous good standing and reputation of the respondent is entitled to much consideration.

6. SAME.
Acts of attorney, while not sufficient to justify disbarment, disapproved by the court.

## Proceedings in Disbarment.

THE attorney general filed an information charging the respondent Horace G. Benson, an attorney of this court, with unprofessional conduct, and praying for his disbarment. Issues of fact were duly joined, evidence taken, and the case

thus made has been submitted upon oral argument of counsel.

Nominally, four charges are preferred against the respondent. *First*, the procuring of straw bail for defendants in a criminal case; *second*, attempting to compound a felony; *third*, defrauding the petitioner Frank Eli of his money; *fourth*, abusing the process of the court. .

The charges arose out of the respondent's connection, as attorney for the defendants, with a certain criminal case, and were preferred by the prosecuting witness. The evidence tends to establish the following facts: In March, 1897, in the city of Denver, Frank Eli, the petitioner, an Italian, understanding and speaking the English language imperfectly, was robbed of $1,205, lawful money of the United States, of various denominations. He reported his loss to the police department of Denver, and from the information then furnished, and the description of the robbers then given by Eli, as published by Chief of Police Russell, four persons were soon thereafter arrested by the police officers at Colorado Springs.

Before the arrival there of the Denver officers detailed to take charge of the prisoners, two of the four apprehended were released, and the other two brought back to Denver. Upon the persons of these two, one of whom Eli recognized as his robber, and as to the identification of the other the evidence is in conflict, were $1,085, which Russell received from the arresting officers, and which Eli claimed to be a part of the money taken from him. The two suspects were placed in the city jail to await a hearing, when the respondent was employed as an attorney to defend them. He visited his clients several times at the jail, and received from them, upon his fee for defending their case, an assignment of said moneys.

Upon the production by Benson of this assignment to the chief of police, and his demand for the money, the officer refused to deliver it. Eli, also, demanded it of the chief of police, and visited him on several occasions for the purpose of getting it, and his demand was likewise refused.

Eli, then, upon several occasions, went to the office of Benson, his object being in some way to get the money through Benson's assistance. The latter told him that the money did not belong to him (Eli), and that to neither one of them would the chief of police voluntarily give it. He also informed Eli that he claimed this money under an assignment, that the defendants were not the persons who committed the robbery, that the money was not taken from him, and that he (Benson) proposed to contest with him its ownership, and carry the case to the supreme court, if necessary.

Upon one or more of these occasions, Eli said to Benson that he had a wife and five children, and no money to support them, and that he wanted to get this money for that purpose, and asked Benson if he could not arrange it for him. After replying to Eli, as aforesaid, the latter claims that Benson told him he would give him $700 " to settle the whole matter; " ·meaning, as Eli claims, to pay him this amount if he (Eli) would let the prosecution drop, and get out of the country. In the appropriate place in the opinion, further reference will be made to what then took place between these two parties. It is sufficient here to say that neither Eli nor Benson was able at that time to get the money.

Benson thereupon took steps to secure this money by what he denominated legal measures. He was indebted, so he says, to Samuel W. Johnson, Charles L. Schlink and Frank Hollingsworth in certain sums of money, and to each he assigned a part of the claim he had against these two defendants, and to each a proportionate share of the money in the custody of the chief of police representing such claim, retaining a part thereof for himself, and these four portions, together with the costs of anticipated suits, equalled the amount of money in Russell's possession.

The two defendants were released from custody under bail procured for them through Benson's instrumentality. Prior thereto, Benson secured from them a written authority to one Milligan, authorizing the latter to accept service

of summons and confess judgment in the said four contemplated actions.

Subsequently the four suits were brought against the defendants before a justice of the peace, whose office was in a remote part of the precinct, service of process was accepted by Milligan under his written authority, and the validity of the claims acknowledged; whereupon judgment was rendered by the court, and executions were issued and placed in the hands of a constable for service. The latter, armed with the writs, went to Chief of Police Russell, and on pretense of wanting the numbers and denominations of the bills in question, induced Russell to produce them for his inspection. While the bills were lying on a table they were seized under this writ and returned by the constable into court and applied upon the four judgments. The foregoing, in brief, presents a general history of the case.

Mr. H. C. CHARPIOT, Mr. E. F. RICHARDSON, and THE ATTORNEY GENERAL, for petitioner.

Mr. JOSEPH C. HELM, Mr. CHAS. D. MAY, Mr. A. M. STEVENSON, and Mr. THOMAS WARD, JR., for respondent.

PER CURIAM. We are clearly of the opinion that there is no evidence at all to sustain the first charge. Whether or not the justice of the peace was imposed on in the matter of the bail which was accepted by him, resulting in the release of the prisoners, is not material to this inquiry; for, if there was any fraud, the respondent is not shown to have participated therein.

The second charge, that of attempting to compound a felony, is altogether the most serious in character, and, if established, should result in the permanent disbarment of the respondent.

For the purposes of this case, it is assumed that Eli was robbed. If, however, any of these charges against Benson depended upon Eli's testimony alone, we would summarily

dismiss the proceeding. We say this after a careful reading of the entire record, from which it is clear that his testimony is entitled to little, if any, credence in matters of such grave importance. True, he testifies that Benson offered him $700 "to settle the whole matter," meaning to convey the impression (though he does not expressly say so) that Benson offered him that sum to compromise a felony, in which testimony he is corroborated by two of his friends. This is positively denied by Benson and other apparently credible witnesses, but what is especially conclusive to our minds that Eli's testimony upon this point should be disregarded, is the following:

Eli reported to Mr. Charpiot, the attorney employed by him, for the sole purpose of recovering the money, the alleged corrupt offer, and Mr. Charpiot, naturally and rightfully indignant, went to Benson's office to ascertain if his client's statement was true, when a somewhat spirited conversation occurred between him and Benson that will be hereafter more fully referred to. After this it appears that Eli, being more desirous of getting his money than to mete out punishment to the guilty, consulted Father Lepore, a Catholic priest, and, without any suggestion or solicitation from Benson, they together went to his office to see, as it was put by them, if some satisfactory arrangement of the whole matter could not be made. At this interview the testimony is conclusive that Eli expressly stated that he theretofore spoke falsely to Mr. Charpiot as to Benson's alleged proposition, and notwithstanding he had theretofore signed affidavits to the contrary, and being warned of the possible consequences of perjury, then voluntarily offered to sign and verify a written statement denying said affidavits and his previous like statements, not under oath;—Benson all the time protesting that if he did so it must be voluntary, without any compensation or hope of reward from him. Thereafter, at the request of Eli and Father Lepore, such a written statement was prepared, and at a subsequent interview where Father Lepore, Eli, Benson, and four or five other witnesses

were present, Father Lepore, both in English and Italian, explained to Eli the contents of the paper which, among other things (not deemed necessary to mention here), contained a positive statement to the effect that no offer of compromise had been made by Benson to Eli, and that his previous statements were false, and with no foundation in fact. The conversation, in so far as it took place in English, was taken down by a stenographer who was then present for that purpose. All of these persons who testified in this proceeding (excepting Eli) unite in saying that Eli then declared the written statement to be correct in all particulars, but refused to sign it unless he was paid the sum of $700. This Benson refused to do, and the matter there ended. In other respects, also, as to the identification of the two defendants brought back, as to the manner of his being robbed, and as to various other matters of more or less importance, Eli is contradicted by apparently reputable and disinterested persons.

In the light of the foregoing, therefore, we find that the only credible and trustworthy testimony in support of the charge now under consideration is that of Mr. Charpiot, known to each member of this court as an honorable and worthy member of the bar of this state. When he learned from Eli of the alleged attempt to buy off this criminal prosecution, he went to Benson's office, and, according to his testimony, which we quote just as it is reported, the following took place:

"Upon going in I met Mr. Benson and asked him if he knew this man (meaning Eli); he said ' Yes.' I asked Benson what his connection was with the affair, whether he represented the chief or whether he represented the defendants as counsel, and he said he represented the defendants as attorney. I asked him whether he had made an offer of $700 to this man by way of compromise; and Mr. Benson said, ' I did,' immediately following this statement by saying, ' This is what I said when this man came and asked for money: I said to him that I could not get the money; that he could

not get the money; that nobody could get the money in the hands of the chief of police, and that if this matter was to be settled, the money would have to be raised on the outside.'"

In this connection it is proper to refer to Eli's own testimony concerning this offer. He says that he first went to Mr. Russell to get some of his money, as he needed it to support his family. Russell refused to comply with his request, and then he went to Benson upon two or three different occasions with the same object in view. He told Benson that he wanted some money for the support of himself and family, to which Benson replied that he thought he could give him some, and then informed Eli that he would give him $700 " to settle the whole matter " in regard to this criminal prosecution, but that none of the money could be got from Russell; that neither he himself nor Eli could get it, and it must be raised on the outside.

Now, if this answer of Benson to Charpiot, as testified to by the latter, be literally the reply as given by Benson, it falls short of being an admission of an attempt to compound a felony. Such, it is true, is the interpretation, or construction, given it by Mr. Charpiot; but it is only fair to say that Mr. Charpiot approached Benson believing that such a corrupt offer was made; and having the interest of an antagonistic attorney in a contest to get this money, he was not in that calm, unprejudiced frame of mind best suited for judicial determination. It is only right further to say that Mr. Charpiot, as we understand him, does not say that Benson admitted his guilt, except as the same is involved in the foregoing reply. The answer, however, in fairness, must be taken as a whole, and in the light of the qualification made in the immediate connection; and, at most, is an admission merely that he told Eli if the matter was settled the money must be procured elsewhere than from Russell. In a matter of so much importance as this, a conviction should not hinge upon any such alleged admission.

But Benson's own testimony should be considered as to

this point, for, if true, it fully explains his answer to Charpiot, and is consistent with his innocence. He denies positively and circumstantially every statement made by Eli and the other witnesses which, in any way, tends to uphold this charge. Coming to the testimony of Mr. Charpiot, his version of the conversation is as follows:

"He said (meaning Charpiot), 'What is your connection with this case?' * * * I answered him about as he has indicated, in the usual way—that I was counsel. He said 'Do you represent the defendants in this case?' I said, 'I do.' * * * He said, 'Do you know Mr. Eli?' I said, 'I do.' He said, 'Was there something said about raising seven hundred dollars on the outside in this case?' I said, 'Yes, sir.' He said, 'I don't think that I care to see you any further,' and he went out in the same way he came in."

Mr. Benson further testifies that at these interviews between himself and Eli the latter himself made the direct proposition that if the entire amount of money of which he had been robbed was returned to him, he would get out of the country and have nothing further to do with the prosecution, which offer Benson says he refused to have anything to do with, and further says that he expressly told Eli he would not give him a cent to leave the country, or to drop the prosecution.

Considering all this evidence together, it is not an unreasonable hypothesis that, in replying to Charpiot, something was said about raising money, Benson referred to the interview at which he claims Eli proposed to get out of the country if the money lost was refunded. We have no doubt that Mr. Charpiot details this conversation exactly as he remembers it, but even as he himself states it, it does not prove the charge. It should be borne in mind that Benson is an attorney at law, and has been engaged in the practice for ten or twelve years. For about three years of that time he was a deputy district attorney of the second judicial district, and engaged continuously in the prosecution of criminal cases. It must be assumed that he knew full well

the consequences of compounding, or attempting to compound, a felony; and if it be true, as a matter of fact, that he did make this attempt with Eli, it is almost incredible that he should unreservedly admit the crime to an attorney whom he knew to be antagonistic and who would use it as evidence against him.   To say the least, before the court would be warranted in finding him guilty under such a charge, the testimony would have to be much more satisfactory and convincing than that in this record.

The second and third charges may properly be considered together, as the same evidence applies to both, and this method is the more satisfactory and expeditious.   Even though it involves more or less repetition of some of the matters already considered, it is necessary to review the entire record somewhat at length.   There was in the hands of a police officer a sum of money taken from the persons of those apprehended upon a criminal charge.   It was claimed to be the fruits of the crime committed, and was held by the officer apparently (though there is no evidence to that effect) until a hearing could be had, to be used as evidence thereat against the defendants.   For the purposes of this case, it may be considered that it was *in custodia legis*, as the attorney general claims.

Respondent testifies that from conversations and repeated interviews with the defendants (his clients), and from information from such other sources as were available, and from an inspection of the complaint filed against the defendants and the process under which they were arrested, he became satisfied that the defendants were not guilty of the charge, that the money held by the officer was not Eli's, that it had not been taken from his person, that it was not *in custodia legis;* and he thereupon, as he thought he had the right to do, took an assignment thereof from the defendants for his fee, and demanded it of Russell.   For all of these conclusions we are unable to say from the record that Benson did not have some reason based upon the evidence before him at the time.   When Russell refused to deliver the money,

he (Benson) concluded, as a matter of law (so he says), that he could sue the defendants directly for his services, and, if he recovered judgment, could then, by a levy of the appropriate writ, get this money from the possession of Russell, and apply it to the satisfaction of his judgment.

There was no concealment by Benson at any time that he laid claim to this money by virtue of an assignment. In the very first interview he had with Eli, the latter was so informed, and unquestionably so understood. Mr. Charpiot, too, knew of it, probably very soon after the claim was made. It is true that Benson knew of Eli's claim, and also that Russell held the money, and it is just as clear that Eli was equally apprised of both facts. It is also evident that each claimant was determined at the earliest opportunity to get possession of this money from Russell, and not only did Benson not conceal this intention from Eli, but he expressly told him his purpose was to get it if he could, by resort to all the courts, if necessary.

The situation then was that there were two claimants for a fund in the hands of an officer; both were striving to get it, neither was willing to wait its disposition at the end of a trial of the prisoners, and each was trying to circumvent the other.

Being indebted to various persons, as he says (and there is no evidence at all to the contrary), Benson split up the claim into four parts, and four suits were brought, judgments secured, writs of execution issued, and the money seized and applied, as hereinbefore stated.

It is said that by this course of conduct Benson defrauded Eli of his money, and abused the process of the court. If, as a matter of fact, Benson honestly believed that this money in the hands of Russell was not Eli's; that it was not in the custody of the law; that it was equitably his own property; —to all of which he testifies,—then, even though he was altogether wrong upon all points, his attempt thus to get his money cannot be considered to be a fraud upon Eli, or an abuse of the process of the courts, such as to cause his dis-

barment. If an attorney is to be visited with this penalty whenever he misconceives the facts or the law, or the remedy for the enforcement of rights which he believes belong to a client, few, if any, attorneys would be safe.

If, however, the record satisfied us that the respondent was actuated by corrupt, or dishonest, motives, or that he wrongfully and intentionally defrauded, or intended to defraud, Eli, or to abuse the process of the court, he should be disbarred.

Moreover, it is vigorously argued that, if Benson honestly believed that the money was his, his suit should have been in replevin against Russell for unlawful detention, or have sounded in damages for unlawful conversion. When, on the contrary, he proceeded directly against the defendants, he repudiated the validity of the assignment thereby evidencing, by such inconsistent conduct, his own disbelief as to the genuineness of his claim thereunder. As evidencing the same disbelief, it is said, were the splitting up of the cause of action so as to bring each claim within the jurisdiction of a justice of the peace, the procuring from the defendants of the power to confess judgment and admit service of process, and the institution of these four suits before a court in a remote part of the precinct, and the seizure by the constable of the money in the hands of Russell.

As a matter of law, we cannot say that Benson's only remedies were replevin and conversion; nor is it true that his election to proceed directly against the defendants, and, by ancillary or direct process under his judgment against them, to reach the money held by Russell, was necessarily inconsistent with his honest belief that the latter method was legal. Benson testifies, as a fact, that he thought and still thinks, he had a legal right so to do. We may say that, if Benson had no description of the bills, and there is no evidence that he had, replevin would not lie, and where one wrongfully converts to his own use the property of another, the latter may not choose to rely solely upon the personal liability of the wrongdoer.

There is no evidence that the constable was acting under the advice or direction of the respondent in seizing the money as he did. In this collateral proceeding it is not proper for us to determine the legality, or illegality, of the different steps taken by the respondent to get this money, unless, and except in so far as, we are compelled to do so by the necessities of the pending case; nor must we be understood as intimating that the defendants, or proper party intervener, might, or might not, have defeated such measures, had timely defenses been interposed.

If Eli was not a party, he is not bound; and the record in this proceeding incidentally discloses that an action is now pending in the proper jurisdiction in which Eli is seeking to recover his money, or its equivalent, and we must assume that, if the evidence therein warrants it, proper relief will be given. We should not, therefore, unnecessarily anticipate that judgment, or prejudice the rights of the litigants one way or the other by declaring, in this proceeding for disbarment, the rights of the parties there. Indeed, it is the proper practice not to entertain disbarment proceedings whilst the conduct complained of is already being investigated in an appropriate action; and where the (alleged) wrong is committed during, or in connection with, the judicial trial of an action, the institution of a proceeding like this should be postponed, or its hearing suspended, until the termination of the action. Had the pendency of this action been seasonably and properly brought to our attention, the foregoing practice would have been observed. But, in any event, it is unquestionably true that the charges here are not wholly dependent upon the regularity or illegality of the procedure in the suits before the justice of the peace. Rather the question is whether Benson's acts show such moral obliquity as to make him unfit to pursue the high and honorable profession of a lawyer.

We think the rule is beyond cavil that in a case of this sort the charges must be established by clear, convincing and satisfactory evidence. It is not necessary in this particular

proceeding to go as far as some courts have intimated, and as some counsel claim to be the law, that the proof should be, as in criminal cases, beyond all reasonable doubt. Certainly, however, before an attorney, charged with unprofessional conduct, is deprived of his license and cut off from the practice of a profession by which he earns his living, the proof thereof should rest upon a more substantial foundation than that produced before us in this proceeding.

In this connection the previous reputation and standing of the respondent is a matter entitled to much consideration. In this record is the testimony of such men as ex-Judge Elliott of this court, of Judges Palmer and Johnson, now judges of the district court of the second judicial district of this state, of Judge Steele of the county court, and of Mr. Monash, president of the chamber of commerce and a prominent business man of the city,—all to the effect that Benson's previous standing as a lawyer and as an honorable man were of the highest; and they testify that until these charges were preferred against him, they never heard anything derogatory to his character. Considering this, in connection with all of the other evidence produced, we are constrained to say that a case has not been made out against the respondent that would justify a judgment of disbarment.

Notwithstanding our conclusion upon these issues both of law and fact in favor of the respondent, it must not be understood that we approve of all his acts, or commend them as precedents that may safely be imitated in like circumstances. Even though respondent, upon strictly legal principles, may have been justified in the method adopted for getting possession of this money, and while due allowance should be made for reasonable zeal of counsel in the effort to accomplish by legitimate means what he honestly considers a worthy object, nevertheless the course pursued by respondent, in so far as it pertains to the institution and prosecution of these suits was, to say the least, most indiscreet. It would have been far better even for his own reputation, as he, himself, must now painfully realize, as well as for the

honor of his profession, had he waited the result of the statutory proceeding which the court, having jurisdiction of a criminal case, usually pursues in determining the right of ownership to such property. And while we do not, as we have said, find said acts to be so censurable as to call for disbarment, and of this finding respondent should have the full benefit, and while we do not, by these reflections, intend to minify the force and proper effect thereof, or desire to detract from its natural and legal consequence, yet when we view said acts from the standpoint of those ethical principles with which every lawyer should square his conduct, we cannot omit this expression of our disapproval.

From the foregoing it follows that the rule to show cause heretofore issued against the respondent should be discharged, and the information dismissed, and it is so ordered.